Filed 1/22/21  B.R. v. Superior Court CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| B.R et al.,<br><br>    Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF MARIN COUNTY,<br><br>    Respondent;<br><br>MARIN COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>    Real Party in Interest. | A161022<br><br>(Marin County Super Ct.<br>Nos. JV26885A & JV26886A) |

Petitioners B.R and T.E. are, respectively, the mother and father of a boy and girl whose initials are both also T.E (hereafter daughter or son, collectively the children).  The parents are not married, but have been in a dating relationship and living together during the entire lives of their children, of whom T.E is the biological father and who was treated by the court as the presumed father.  The daughter was just under three years old when the children were removed from the home and reunification services were ordered, and the son was then just under two years of age.  The petition alleged that the children were those described by Welfare and Institutions

1

Code section 300, subdivision (b),[1] as they were at substantial risk of serious physical harm or illness due to the parents' failure to provide adequate nutrition and health care and due to mother's mental illness.

Mother asks us to issue a writ of mandate or prohibition compelling respondent superior court to vacate its September 17, 2020 finding that reunification efforts should be terminated because, despite the provision of reasonable reunification services, mother failed to progress in her case plan. She asks that we vacate the order terminating reunification services and the order setting a hearing pursuant to section 366.26. Mother contends the court erred in failing to apply the proper legal standard at the six-month review hearing and in finding that she had been provided reasonable reunification services.

In his separate petition father also maintains termination of reunification services was an abuse of discretion in that reasonable services had not been provided. Father also contends the court erred in finding that he had not complied with the essential elements of his reunification case plan. He also asks us to reverse the order terminating reunification services and remand the case for new orders extending the period for reunification services as to him.

In a case such as this, in which the children are less than three years old at the time removal and reunification services have been ordered, section 361.5, subdivision (a)(3) requires the court to inform the parent that the failure to participate regularly in any court-ordered treatment programs or utilize reunification services may result in a termination of reunification services after only six months. The purpose of the otherwise inapplicable six-

---

[1] All subsequent statutory references are to the Welfare and Institutions Code.

2

month limitation "is to give juvenile courts greater flexibility in meeting the needs of young children, 'in cases with a poor prognosis for family reunification (e.g., chronic substance abuse, multiple previous removals, abandonment, and chronic history of mental illness).' [Citation.]" (*Daria D. v. Superior Court* (1998) 61 Cal.App.4th 606, 611.) The Legislature apparently felt that " 'very young children . . . require a more timely resolution of a permanent plan because of their vulnerable stage of development. . . . [G]iven the unique developmental needs of infants and toddlers, moving to permanency more quickly is critical.' " (*Id*. at p. 612.)

## BACKGROUND

In November 2019, the Concord Police Department arrested mother after she ran into traffic on a six-lane freeway with her children in her arms.[2] The police report stated that the boy appeared "extremely malnourished to the point of starvation" and was either exceptionally dirty or had a serious skin disorder. Both children were immediately hospitalized.

The following day, the police were informed by the hospital that the boy was dangerously under nourished and his unusually low sugar level created a serious medical condition. At the time he was admitted, the son weighed under 12 pounds, which was in the negative sixth percentile for weight for his age. Because the IV failed to supply sufficient nutrients, nurses inserted a peripherally inserted central catheter, or PICC line, as a lifesaving measure. Hospital physicians determined that the malnutrition of the children was a "direct result of neglect and malnutrition/dehydration, and could not have been caused by genetics or trauma" or other natural causes.

---

[2] The arrest was for willful cruelty to a child, inflicting injury upon a child, battery on a peace officer, vandalism, and obstructing/resisting a public officer.

Father, who was aware mother had been arrested and the children hospitalized, told an investigating social worker that mother had left home with the children for about a week. He did not know where they went, although he did on one occasion speak with mother on the phone. While they were away, mother's sister called him and said mother was "out of her mind." Father believed mother's weight loss and erratic conduct may have resulted from her use of cocaine. During the last four months, she often left with the children for up to a week without telling him where they were going. Father believed she could be suffering from schizophrenia or another mental illness and was concerned about the health of the children. Doctors had told him and mother on several occasions that their children were dangerously malnourished, and they had received counseling about how to increase the children's weight. Father also disclosed that the daughter had been hospitalized for a week for malnutrition two years ago when the family was living in Nevada.

Father entered foster care when he was 10 or 11 and later reunified with his mother, but his father was "always gone." He had five siblings, some of whom suffered from drug addiction, which he said was why he never used drugs, though he does occasionally smoke marijuana and cigarettes. Father took some community college courses and had been steadily employed since high school. At present, he worked for the Marin County Elections Department and was periodically employed as a public school janitor. Father had three other children, paid child support for them, and said he was on good terms with those children and their mothers. He has no criminal history.

Father met mother about 10 years ago while working at a grocery store across the street from where she was then living. After the children were

born, mother never worked, but stayed home taking care of the children while he paid the bills. Father acknowledged his need to better understand mother's mental illness to learn when she was able to safely care for their children, and when she was not, and it was necessary for him to intervene to keep them safe. Father said he did not suffer any mental disorder and was not a substance abuser. The investigative social worker was able to engage father in conversation, but was concerned about his seeming inability to see the connection between his own conduct and the health and well-being of his children, and his failure to realize the seriousness of their obvious malnutrition and other serious medical problems.

At the time mother was arrested, father had not seen his children for three or four weeks and did not know where they were until mother called after her arrest. Before the events that led to mother's arrest, he would buy groceries for the family, but did not feel responsible for feeding the children and was frustrated that though mother was home all day she never prepared food for the children. He wanted the children returned to his care, but admitted he would have to change his behavior by ensuring the children were fed regularly.

Father's work hours were cut in March 2020 due to the COVID-19 shelter-in-place orders. It was hard for him financially to support mother and he wanted her to find employment. However, despite the hardships, he maintained stable housing throughout the reporting period and consistently participated in service and visits with his children. He was hopeful his normal work hours would soon be restored.

Mother was born in Berkeley and grew up in the Bay Area. She is the middle of three children. She was raised by both parents until her father died in 1996, at which point she was raised by her maternal grandmother.

She lived with the grandmother and 12 other people including siblings and cousins and was required to help clean up the house and cook. She denied abuse of any kind. Mother gave birth to a daughter when she was 15, and that child was raised by her maternal grandmother. She completed high school through a home study program and left home at 17. She completed some courses at community college, where she studied small business administration. Her goal was to open a hair salon or clothing store. She left the community college to support herself as a cashier at a pizza restaurant and as a receptionist for a newspaper. She was currently unemployed and received support from her sister and Social Security.

Mother told a counselor she felt paranoid and claustrophobic all of her life and that in July 2019, she had been experiencing paranoid thoughts and auditory hallucinations. Around that time, she began acting erratically; leaving home with the two children she had with father for long periods of time, not feeding the children, and not eating much herself. In November 2019, she went to a hospital and was diagnosed with schizophrenia and prescribed Risperidone, which she did not take. She was in and out of a hospital in Martinez until transferred to an acute psychiatric facility in December 2019. Mother's only criminal history was an arrest for misdemeanor petty theft in May 2012. She successfully completed diversion and the case was dismissed.

The investigating social worker reported that mother was able to engage in normal conversation, but seemed exceedingly paranoid. Mother appeared to be aware of the severity of her children's condition, but the social worker was doubtful mother would be able on her own to come up with and adhere to a sensible plan to protect her children's health and safety.

6

On November 8, 2019, the Marin County Department of Health and Human Services (Department) filed petitions pursuant to section 300, subdivision (b), alleging that the children were at substantial risk of serious physical harm or illness due to parents' failure to provide adequate nutrition and medical care and mother's mental illness.

On November 12, 2019, the children were detained and removed from the family home. The daughter was temporarily placed in foster care and the son was placed in an acute rehabilitation unit at Children's Hospital, where he was fed with a PICC line or a G-tube (a gastrostomy feeding tube) and received feeding and speech therapy. The court also ordered twice-weekly in-person visits for the parents while the children were in foster care or hospitalized.

The detention report described the Department's serious concerns about the parents' inability to appreciate and address the alarming condition of their children. Despite numerous consultations with physicians and other health professionals about the malnutrition of their children, which was obvious from their appearance, the parents failed to follow the advice they repeatedly received or even to appreciate the severity of their children's deteriorating condition.

At the close of the detention hearing, the juvenile court carefully explained to the parents, as it was required to do by section 361.5 subdivision (a)(3), that if they did not make substantive progress during the six-month period that was then commencing, their parental rights might be terminated.

In its January 2, 2020 disposition report, the Department reported that mother—who had then been released from custody and was on a psychiatric

7

hold[3]—had been diagnosed with schizophrenia and prescribed anti-psychotic and other medications, which she was taking. She had been assessed by an agency affiliated with the Department for therapy, psychiatric services, and assisted in management of her case plan. Mother welcomed the assistance and committed to take her medications. Nevertheless, the Department felt she continued to minimize the danger in which she placed her children and continued to believe her son's physical and mental development was normal. The report emphasized the need for mother to significantly improve her understanding of her children's important nutritional and developmental needs, and demonstrate a willingness to accept the medical assessments and recommendations of the physicians who examined or treated her children. The Department felt that without these behavioral changes the children would continue to be at risk if committed to mother's care.

As to father, the report stated that he visited his son daily in the hospital and regularly visited his daughter in the Department's offices. His visits were "positive" in that he believed a parenting class would be useful, and said he wanted to "make sure this never happens again." Father also recognized his need to better understand mother's mental illness to know when she was unable to safely care for their children and he needed to step in and help. The Department remained gravely concerned about father's consistent failure to intervene in mother's negligent care despite the children's visible malnutrition and physical deterioration. The report also described its continuing concern that father placed the blame for the negligent care of the children entirely on mother. Moreover, like mother, he failed to appreciate either the severity of the children's prior deterioration or

[3] The Department had previously filed a jurisdiction report on December 11, 2019, but because of mother's psychiatric hold, the matter was put over for a combined jurisdiction/disposition hearing.

his own responsibility to protect them.  It was therefore as necessary for father to increase his knowledge of the nutritional and developmental needs of the children as it was for mother.

On January 7, 2020, the court found the allegations of the amended petitions to be true, adjudged the children dependents of the court, ordered out-of-home placement and reunification services, and set a date for the six-month review.

In a June 25, 2020 status review report for the six-month review hearing, the Department recommended termination of reunification services to both parents chiefly due to their mutual failures to demonstrate an understanding of the severity of the consequences of their negligence or an ability to prevent such negligence in the future.

The report described the daughter's low iron and anemia as improving due to the efforts of her foster or "resource parents," but she still suffered numerous food allergies and sensitivities and was on a non-dairy gluten free diet.  The daughter also suffered fine motor and speech delays and other developmental difficulties, such as vomiting after eating or crying and panicking when she saw others eating food.  Until June, the daughter would wake up screaming and crying after personal visits with her father or mother and the Zoom visits later required by shelter-in-place requirements.

With respect to the son, the status review report stated that he was diagnosed with severe malnutrition and failure to thrive when admitted to John Muir Medical Center on November 6, 2019, was dehydrated, hypoglycemic, had electrolyte abnormalities, poorly controlled atopic dermatitis, and alopecia.  He was discharged from John Muir on December 2, 2019, after placement of a G-tube for feeding under general anesthesia, and transferred to UCSF Children's Hospital in Oakland and remained there

until January 2020 (all subsequent dates are in that year). He was then placed in a licensed resource family home with a pediatric nurse practitioner who coordinated and oversaw his daily tubal feeding. During this period, he received treatment from numerous health care providers for gastroenterological, hematological, and dermatological problems.

On September 17, after a three-day contested six-month review hearing at which the court heard the testimony of numerous witnesses, the court found that the Department "has complied with the case plan by making reasonable efforts to return the child[ren] to a safe home through the provision of reasonable services designed to aid in overcoming the problems that led to the initial removal and continued custody of the child[ren] and by making reasonable efforts to complete whatever steps are necessary to finalize the permanent placement of the child[ren]; (2) neither mother nor father had "made minimal progress toward alleviating or mitigating the causes necessitating placement"; (3) "by a preponderance of the evidence, the return of the child[ren] to his or her parent[s] . . . would create a substantial risk of detriment to the safety, protection or emotional well-being of the child[ren]"; (4) "[b]y clear and convincing evidence the mother and presumed father failed to participate regularly and make substantive progress in a court-ordered treatment plan"; and (5) the mother and presumed father are each "unable to make decisions regarding the child[ren's] needs for medical, surgical, dental or other remedial care."

After the court explained at length the reasons for its determinations, it scheduled a hearing pursuant to section 366.26 to select the most appropriate permanent plan for the children.

Mother's and father's writ petitions seeking relief from the September 17 orders were both timely filed.

## DISCUSSION

Mother contends the juvenile court erred by failing to apply the proper legal standard at the six-month review hearing and determining that she received adequate reunification services. Father claims that the court erred by finding that he failed to comply with the requirements of his reunification case plan and that he received reasonable reunification services.[4]

### *The Standard of Review*

Section 366.21 provides that where, as in this case, "the child was under three years of age on the date of the initial removal . . . and the court finds by clear and convincing evidence that the parent failed to participate

---

[4] Father's claim that he participated in the development of the reunification plan and complied with its requirements seems to be based on the belief that the court found he did not participate in the court-ordered treatment programs described in the reunification case plan. It is true that the September 17 order states that "By clear and convincing evidence mother and presumed father *failed to participate regularly* and make substantive progress in a court-ordered treatment plan." (Italics added.) However, in the course of explaining its ruling, the court asked the rhetorical question "did the parents participate in the treatment programs specified by the reunification plan," and answered: "Yes." The court observed that "their participation was not perfect, but perfection is not required. They did participate." Finding that "[t]he mother and presumed father were actively involved in the case plan development," the court ordered the setting of a section 366.26 hearing on the sole ground that the parents "made minimal progress toward alleviating or mitigating the causes necessitating placement." Under section 366.21, subdivision (e)(3), the court may schedule a 366.26 hearing if the parents of a child under three years of age "failed to participate regularly *and* make substantive progress in a court-ordered treatment plan." (Italics added.) Therefore, a child can be removed from home and a section 366.26 hearing scheduled solely on the basis of the parents' failure to make "substantive progress" in eliminating the factors that resulted in removal of the children, as was done here.

Thus, father really advances only one pertinent contention: that he was not provided reasonable reunification services, a claim also advanced by mother.

11

regularly and make substantive progress in a court-ordered treatment plan, the court may schedule a hearing pursuant to Section 366.26 within 120 days," and that if the court did not make that finding it "shall direct that any reunification services previously ordered shall continue to be ordered to the parent" in a specified manner. (§ 366.21, subd. (e)(3), (7).)

Mother's contention that the court applied the "wrong legal standard" at the six-month review hearing focuses on the court's finding that "by clear and convincing evidence" she failed to "make substantive progress in a court-ordered treatment plan." This was error, mother argues, because the court "did not apply the legal standard for 'substantive' progress to the facts of this case." This is so, mother says, because since the removal of the children, she "has made substantive progress towards eliminating the condition that" caused the removal of the children. As mother states, at the time the children were removed, mother "was experiencing paranoia, delusions and had to be involuntarily hospitalized," but she has had "no further psychiatric incidents since that time, has been compliant with her medication, . . . has been attending therapy[,]" and, as a social worker "specifically testified" she has made "progress in management of (her) mental health symptoms."

Mother is not, as she puzzlingly seems to be saying, in fact arguing that in determining whether the parents made substantive progress in a court-ordered treatment plan the court failed to apply the clear and convincing evidence standard mandated by section 366.12, subdivision (e)(3), which the court explicitly did. Mother is in reality challenging the adequacy of the evidence to support the finding that she failed to make "substantive progress."

Elsewhere in her petition, mother asserts that the "crux of the legal disagreement" in this case is that the Department "required mother to show

12

that she was able to parent and because they asserted that she could not articulate how she would do this, they recommended terminating her services. . . . However, the law does not require parents to show an ability to parent at the six-month review, rather, it requires a showing of participation and substantial progress towards eliminating the conditions that led to removal," citing subdivision (e) of section 366.21. As we shall explain, this is clearly not the case.

This appeal essentially presents two questions: whether the parents failed to make "substantive progress" in their court-ordered treatment plans, as required by section 366, subdivision (e)(3), and whether "reasonable services that were designed to aid the parent[s] . . . in overcoming the problems that led to the initial removal and the continued custody of the child have been offered to the parent[s]," as mandated by section 366.21, subdivision (e)(8).

In a dependency case like this one, we stated that an appellate court is obliged to view the evidence "most favorably to the Agency, which is the prevailing party, and indulge all legitimate and reasonable inferences to uphold the trial court's order. [Citations.] If there is substantial evidence supporting the judgment, the court's order must be affirmed. [Citation.] ' " 'Substantial evidence' " is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value. [Citation.]" ' [Citation.] ' "Inferences may constitute substantial evidence, but they must be the product of logic and reason. Speculation or conjecture alone is not substantial evidence." ' " (*Patricia W. v. Superior Court* (2016) 244 Cal.App.4th 397, 419–420 (*Patricia W.*).)

Our Supreme Court has subsequently adjusted the nature of appellate evaluation of the sufficiency of evidence in support of a factual finding when

the clear and convincing standard of proof applied to the trial court, as mandated in this case by section 366.21, subdivision (e)(3). The recent opinion in *In re Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012 (*O.B.*) holds that "an appellate court must account for the clear and convincing standard of proof when addressing a claim that the evidence does not support a finding under this standard. When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." In other words, the clear and convincing evidence standard does not disappear on appeal.

We, of course, adopt the standard of review prescribed by our Supreme Court in *O.B.*

### *The Court Correctly Found that Parents Failed to Make Substantive Progress in the Court-Ordered Treatment Plans.*

As we have said, mother's claim that she was making "substantive progress" in her court-ordered treatment plan is based on the facts that she is no longer paranoid and delusional, has experienced no further psychotic episodes, regularly takes the medications prescribed for her, has been benefitting from mental health treatment, and is following her doctors' recommendations. She maintains that these achievements eliminated the conditions that led to removal of her children.

The Department acknowledges mother has been taking her medications and is no longer experiencing psychotic episodes, but believes

14

she, and to a lesser extent father, remain unable to appreciate both the gravity of their children's medical conditions and their own inability to satisfy their children's unusually high needs.

The fact that the parents satisfactorily participated in the treatment programs that comprised their case plans is not dispositive. As we said in *In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1143, "simply complying with the reunification plan by attending the required therapy sessions and visiting the children is to be considered by the court; but it is not determinative. The court must also consider the parents' progress and their capacity to meet the objectives of the plan; otherwise the reasons for removing the children out-of-home will not have been ameliorated."

The lengthy status review report for the six-month hearing, which was prepared by Julie Nigro, the primary social worker assigned parents, specifically addressed the question whether the parents had made "substantive progress" in their treatment plans and concluded, for a variety of reasons, that they did not.

The chief reason for this conclusion was that the parents "lack of insight or understanding includes an inability to describe why the children were brought into care, how they are doing now, or what they will need in the future. Throughout the reporting period, [parents] claimed that the [son] was walking and talking before his hospitalization, which his medical providers say is impossible." Additionally, despite the efforts of numerous social workers, counselors, and therapists to inform the parents of the severity of their children's condition, mother was "unable to describe . . . the extent of the children's medical needs when they came into care or the reason for their hospitalizations." After Nigro conveyed to mother the continuing concerns about her and father's inability to explain their children's past, current, or

future needs, "[mother] emailed both of the resource parents stating, 'Hi I'm trying to put together a plan so I have some questions what are [the children's] medical need; what are his developmental need, what are his nutritional needs.  What the schedule is [*sic*] have for him.'  Despite both resource parents responding to [mother] with lists of daily routines, medical providers, and other information [mother] was still unable to name anything beyond that the children need solid food and [the son] has a G-tube during the next meeting with [Nigro]."

Both children had had serious eating disorders, arising from the fact that they were starved during the period before mother was arrested.  The girl could not easily hold food down and vomited frequently, and the infant son was hospitalized and fed tubally for months after mother's arrest.  According to Nigro's report, the parents remained confused about appropriate food throughout the reunification period.  "For example, after going over a list that [the son's] resource parent gave [Nigro] and the parents about the foods [the son] can eat, [Nigro] asked [mother], 'so what can [her son] eat?' [Mother] replied that he can only eat chicken and maybe mashed potatoes.  She later said he cannot eat mashed potatoes because there is coconut in mashed potatoes and [her son] is allergic to coconut.  She then repeated that all he can eat is chicken.  Despite the list stating that food must be cut into pieces that can be swallowed, [mother] stated that [her son] could eat chicken the size of a chicken nugget and full carrot sticks.  This all happened immediately after going over the instructions in detail."

Even after repeated interventions by Nigro and several other social workers and therapists, the parents "continued to struggle understanding what food the children could and could not eat during the visits" with them at

16

the Department.[5]  For this reason, the Department's public health nurse limited the parents' ability to bring food to their visits with the children. Nevertheless, because father felt the children were not getting the food they liked at their placements, the parents started giving the children inappropriate food they could take back to eat at their placements.  On one occasion, the parents sent the daughter home with a peanut butter candy despite knowledge of her peanut allergy.

The report for the six-month hearing also described mother's failure to comply with the mental health treatment prescribed in her treatment plan, and to appreciate the importance of this treatment, because it related to her ability to adequately attend to the needs of her children.  According to Liz McCann, mother's mental health therapist, mother's participation and attendance at appointments with the Marin IMPACT team[6] had become "irregular" and she was uncommunicative with McCann and other members of the team.  The report quotes McCann's assessment that mother "can state that she 'needs to take her meds,' but she remains unable to say why or discuss her mental health symptoms in any way beyond that.  [McCann] feels that [mother] still needs a lot of help to 'understand her mental health and its impact on her functioning.'  To date, [mother] has not been able to display an awareness about her mental health symptoms or develop a plan on how to manage her mental health symptoms moving forward."

---

[5] The record does not explain why all or some of the parents' visits were conducted at a place designated by the Department rather than at the homes of the resource parents at which they were placed.

[6] That is, the Integrated Multi-Service Partnership Assertive Community Treatment (IMPACT) Full Service Partnership, which is apparently affiliated with the Marin County Behavioral Health and Recovery Services organization.

17

Acknowledging that the parents "showed a lot of commitment to this case plan goal and regularly showed up to services," the report stated mother "was unable to demonstrate an increase in awareness or knowledge of the children's physical, emotional, medical, and educational needs by participating in these services." Despite attending the Positive Parenting in Challenging Times class for several months, "neither [mother] or [father] were ever able to name a single thing that they learned there. When asked what they [discussed] in class, [mother] never responded and [father] would state that there was no way he could learn in class because the other parents in the class talk about teenagers." Though encouraged to ask questions, especially to the parents of teenagers because they might remember how to take care of preschool-age children, "the parents were unable to do this."

At the three-day contested hearing that commenced on September 2, 2020, Julie Nigro was the Department's first witness.

Asked "what most concerns the Department about the lack of behavioral progress in this case that you have documented," Nigro answered as follows: "In this case the parents were very good about service compliance. They were able to show up at many scheduled meetings and appointments. They showed up on time; unfortunately they weren't able to demonstrate that they had a solid understanding of the children's medical, developmental, emotional, and other needs, which in this case are very vast. [¶] . . . . [B]oth parents were not able to demonstrate that they could meet their children's needs at this moment by even explaining what they are or how to meet them . . . [;] unfortunately, there was a lack of the parents' ability to develop a safety plan that could keep the children safe in the future. [¶] And so without that demonstrated behavioral change, without the Department seeing that the parents had an understanding and could actively apply those

18

things, the Department couldn't recommend a return because there hadn't been any behavioral change. There had only been [reunification] service compliance in this case."

The Department also had "concerns about the parents' ability to meet services when new things present themselves, when there are new challenges or new struggles," such as dealing with the problem of preventing infection by COVID-19. "The parents have been very successful at coming to things that are already in place—services and routines that are already in place; but when things change or new services are added, the parents have demonstrated a struggle, which is a concern in this case given that both children have a very high level of needs. So it raises the concern that if the children have any needs that present themselves, will the parents be able to respond in an appropriate amount of time."

According to Nigro, "the Department, myself, my superior, and members of our team have assessed that it is very highly unlikely that additional services would result in the Department feeling that the children can safely return home." Nigro pointed out that "the parents were offered many services including many intensive [ones] such as wraparound and the IMPACT team, but also a wide variety of other services. They went to a parenting support group. They had a wraparound clinician. They had team meetings. . . . [Father] was referred to individual sessions with a therapist. [Mother] had therapeutic services. There were many different types of services. [¶] Unfortunately, all service providers as well as the Department's individual assessment has been that the parents haven't been able to, unfortunately, absorb the information that was presented to them and that those—vast array of services as well as to be able to even so much as name the children's needs, or how they could safely meet them in the future."

Dr. Dana Oertel, a psychologist employed full time at Napa State Hospital who also maintains a private practice specializing in child and family forensic issues, testified for the mother. Dr. Oertel testified that the psychological evaluations of mother relied upon by the Department were inadequate because they did not rest on its own investigation of her current mental condition, but on the assessments of others that she was schizophrenic, and at least one psychological evaluation was untimely. Leticia McCoy, who also testified for mother, facilitated a class in "positive parenting" that mother attended and testified that she "made a lot of progress" in that class, displayed insight into her situation, and was committed to improving her parenting skills.

Mother did not testify. Father's very brief testimony was limited to his personal history and present and past employment.

On September 17, after all of the testimony was received, the presiding judge, the Honorable Beverly K. Wood, provided a lengthy and very thorough explanation of the reasons for her decision to terminate reunification services and schedule a permanent planning hearing.

After addressing several preliminary matters, Judge Wood turned to the main issue before us. Positing the rhetorical question: "Did the parents make substantive progress in the case plan?" Judge Wood answered in this way:

"I want to say that these parents have tried. They've attended classes, meetings, and visits. They love their children. I believe they really do.

"And I'm—but we are now 10 months from detention. The testimony from the social worker and the providers indicate that, despite the participation, these parents are not able to absorb the information, and there's no evidence that they understood the issues.

20

"There was testimony that information is provided repeatedly. There was testimony that minor behavioral changes might take place temporarily, but devolve into old behaviors or asking the same questions time and again.

"When questioned about the children's needs, the parents were unable to articulate. Does that mean that they don't understand? I mean, counsel for the parents makes a good point. Just because somebody can't articulate something, does that mean they don't understand?"

Judge Wood agreed that "[m]other has insight into having a mental illness," but found "she has not been able to expand or explain why and how that affects her parenting."

In the view of Judge Wood, the parents' participation in reunification programs did not alter the fact that "these parents are not able to absorb the information, and there's no evidence that they understood the issues."

Judge Wood allowed that "father's failure to observe and address the alarming and severe malnutrition of the children is less clear" than that of mother. On the other hand, "father was present in the household, and, while mother would often disappear for periods of time, the condition of the children was chronic, not situational; and, therefore, easily observable over a significant length of time. [¶] Father appears to have minimized mother's mental health issues and the condition of the children." To address these issues, the court observed, mental health and parenting services were provided father as well as mother.

The court also discussed the testimony of Letitia McCoy, the witness mother relied upon most heavily. McCoy was unsure whether her 12-week class covered the subject of nutrition, but said that if it did "it was very briefly."

McCoy had testified that mother was "a little quiet at times," but "very conscientious," and had "the ability to learn from the class." Asked whether "she made any progress in the class" she testified that in the beginning she was pretty quiet. But afterwards, she became very engaging with other parents and sharing information, asking more questions. Asked whether any questions she asked during class "displayed any insight?" McCoy responded: "Yes. It appeared she had a great amount of insight, because she had visits with her children, and she would come back and share information that was relative to the subject matter that we had from the previous week." McCoy also testified that she provided her students her cell phone number and urged them to call her if they wanted information, and she had phone conversations with mother. On one occasion, mother phoned McCoy to ask for information about nutrition and McCoy said she would get it for her. Mother called her on the phone because "she didn't feel comfortable sharing" her interest in nutrition with her classmates, and wanted to discuss it with McCoy privately. McCoy stated that she had never seen mother interact with either of her children, and indicated she was not very familiar with her personal history.

McCoy said nothing on direct about father, who was also a student in her class, but said father attended only about 6 of her 12-class sessions.

In her ruling from the bench, Judge Wood noted that McCoy "was very supportive of mother," but her class did not address the crucial issue of nutrition in any depth, and McCoy "was not even aware nutrition was an issue for mother until right before the hearing." Although students were encouraged to ask questions in the class on matters of concern to them for public discussion, neither parent ever brought up the issue of nutrition in the parenting class. Judge Wood felt mother's unwillingness to engage in public

discussion of her biggest reunification problem "further demonstrates that mother just does not understand or make the necessary connections."

The gist of Judge Wood's analysis seems to us much the same as that of the trial judge that we found persuasive in *In re Dustin R., supra*, 54 Cal.App.4th 1131. In that case, the juvenile court found a substantial risk of detriment to the child not because of the parents failure to complete the reunification plan, which the mother was close to completing, but the finding of a psychologist's report to the Department " 'that the parents have a very limited awareness of both the emotional and physical needs of their children and they do not recognize how their past behavior and maltreatment of their children has influenced the children's development; and, without that understanding and with the inability to clearly see the situation, that it would be detrimental to return these children.' " (*Id.* at p. 1142.)

Because the same can be said of the court's ruling in this case, we shall find the court's finding, by clear and convincing evidence, that parents failed to make "substantive progress" in meeting their court-ordered treatment plans is supported by substantial evidence. (See *O.B., supra*, 9 Cal.5th at pp. 1011–1012.)

### *Petitioners Were Provided Reasonable Reunification Services*.

The reunification services an agency is required to provide must be " ' "specifically tailored to fit the circumstances of each family" ' " and " ' "designed to eliminate those conditions which led to the juvenile court's jurisdictional finding. . . ." ' " (*In re K.C.* (2012) 212 Cal.App.4th 323, 329.) Specifically, the record must show the " 'agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents [when]

23

compliance proved difficult. . . ." ' " (*Id.* at pp. 329–330.) The adequacy of the plan and the agency's services are adjudged according to the specific circumstances of each case, and " ' the effort must be made to provide reasonable reunification services in spite of the difficulties in doing so or the prospects of success.' " (*Id.* at p. 329.)

Parents both claim the Department failed to provide adequate reunification services in three ways: (1) an inadequate and untimely psychological evaluation; (2) failure to provide education regarding nutrition, and (3) failure to provide in person visitation so that the mother could show, implement and practice what she had learned through her services while interacting with her children.

The juvenile court found, and the parties appear to agree, that the problems leading to the loss of custody in this case were mother's mental illness (which gradually came under control as a result of mother's medications), father's minimization of that illness, and—most significantly— both parents' failure to respond to the counseling they received about how to deal with the children's eating disorders.

As we have explained, the paramount problem was parental failure to satisfy the basic nutritional needs of the children, which was the central focus of almost all of the reunification services provided in this case, including the mental health services that approached mother's difficulty meeting her children's nutritional needs from that perspective, which was reasonable.

The issue of nutrition appears not to have been raised in McCoy's parenting class because that "drop-in" class was designed as a forum at which parents specified the subjects discussed by questions relating to the problems they were experiencing, which they were encouraged and expected to raise as

issues for discussion. Evidently, none of the other parents in McCoy's class confronted the nutritional problems in feeding very young children and the parents in this case, to whom it was the central problem, inexplicably failed to ever raise the issue.

Abundant evidence supports Judge Wood's finding that the services provided by the Department were reasonably designed and adequate to remedy the mental health and nutritional problems that beleaguered parents.

The July 2020 status review plan identified the 28 distinct services that it provided parents during the reporting period, which included numerous meetings between counselors and clinicians and the parents, individually and together. The Judge singled out the IMPACT team, which she described as "the highest level of intensive outpatient help designed for parents with mental health issues." The team included a case manager, health and mental health therapists for each parent, counselors expert in finding available social services, and a nurse practitioner. These service providers were almost always available to parents, in addition to the weekly therapy scheduled for them. In addition, "social workers provided regular child and family meetings held to review the case plan goals, decide what was working well and what wasn't." The public health nurse who was part of the team that met with parents in this case discussed "toddler nutrition."

Kristin Lamping, the Department's mental health practitioner, regularly conducted therapeutic meetings with parents and her efforts also focused on nutrition and "portion control." She provided the parents "plates, handouts, and real-time coaching about appropriate feeding for [the daughter]" given her allergies and eating disorders. The resource parent the Department selected for the son was a pediatric nurse practitioner who was

present during many of the parents' visits and provided help as to how the son needed to be fed, and his complex medical needs handled.

Julie Nigro, the primary social worker, met regularly with the parents and also focused on nutritional issues, which the Department quickly realized was most important.

Lamping, the mental health practitioner, also provided "psychoeducational services" for father regarding his need to better understand mother's mental health issues and the need for him to assist in meeting the needs of their children. Judge Wood also noted that the parents "characterological deficits" were addressed by tailored sessions with Betty Russell, the intensive teams, and the more generic parenting class, run by Letitia McCoy and Michelle Kemp.

In determining whether the reunification services parents received were tailored to their needs and adequate, Judge Wood reviewed our opinion in *Patricia W., supra*, 244 Cal.App.4th 397, which parents relied upon. In that case, we held there was insufficient evidence that adequate reunification services were provided either parent. The problem that led to the child's detention was the mother's failure to properly take her own medication, and the failure of the agency to diagnose mother's mental illness and her medication needs as part of a case plan, much less help the parents ascertain whether and how they could more effectively manage and monitor the mother's medication to avoid another relapse. While the agency obtained court approval for psychiatric examinations of the mother, it did so only as a means of potentially avoiding the need to provide reunification services due to her mental illness. The only evidence of the results of psychiatric examinations of the mother were several sentences in a social worker's report that shed little or no light on the examining psychologists' conclusions or the

mother's condition. The mother had a treating psychiatrist, but that person was not called as a witness. (*Id.* at p. 401.)

Judge Wood noted that the situation in *Patricia W.* was similar to this case in that the parents challenged the sufficiency of the reasonable services provided, but she concluded—correctly—that the services provided in that case were "far short of the intensive services provided to mother and father here." Moreover, unlike the mother in *Patricia W*, the mother in this case was regularly taking her prescribed medications for an admitted mental illness and there was no reason to believe she would not continue to do so; her mental illness was therefore not as central to this case as it was in *Patricia W.*

The parents also rely on *Patricia W.* for support of their claim, buttressed by the testimony of Dr. Oertel, that the Department's psychological evaluation of mother was inadequate and untimely.

Acknowledging that the Department required mother to undergo a psychological evaluation as a means of identifying the appropriate reunification services, mother claims that (1) Julie Nigro, the social worker who developed the case plan "is not an expert in schizophrenia or mother's particular mental health needs and diagnosis, even if aware of that diagnosis" and (2) the evaluation of mother by Dr. Shelley was not sought until March 2020, and not provided to the reunification team until May or June, when the reunification process was already well underway, and therefore played no meaningful role in the development of the parents' case plan. The asserted untimeliness of the psychological evaluation of mother is wholly unlike the problem in *Patricia W.* In that case, there was no clear diagnosis of the mental condition of the mother and father at the outset, the agency never identified the mental illness, and the psychologists who

27

evaluated the mother did not testify; nor did any therapist, clinician, or mental health professional testify at any of the hearings in the case. (*Patricia W., supra*, 244 Cal.App.4th at pp. 422–423.) A judge suggested a psychological evaluation of the father in *Patricia W.* yet "there [was] no evidence father received a mental health evaluation thereafter or that the Agency sought to obtain one." (*Id.* at p. 428.)

In the present case, there never was any significant uncertainty about the diagnosis of mother, nor any claim that she was not mentally ill or schizophrenic. Both parents disclosed that mother had recently been diagnosed in Nevada as suffering from schizophrenia, neither ever suggested she suffered a different mental disorder, and Dr. Shelley apparently confirmed mother's schizophrenia. Moreover, the Department quickly realized and closely monitored the connection between mother's schizophrenia and her ability to safely parent her children, most specifically her ability to properly feed them.

Julie Nigro testified that at the outset of the reunification period mother's mental health was closely monitored by the psychiatrist and mental health therapists on the IMPACT team. Liz McCann, met weekly with mother and evaluated her mental health, which was also evaluated by Dr. Shelley.[7] The IMPACT team also included a nurse practitioner who ensured that she consistently took her medications, which were over time having a salutary effect. Kristin Lamping also made weekly 90-minute therapeutic visits to mother. The purpose of these visits, she testified, was to determine "possible mental health concerns of either a parent or a child to see if there are any safety concerns, to see if there is anything to worry about"

---

[7] Father also participated in a psychological evaluation, administered by Dr. Main.

28

and "also to look more carefully at the interaction of the children and the parents."

Lamping focused at first on the effect, if any, of mother's mental illness on her interactions with the children, but it soon became clear that the more immediate problem was "the parents' having a tendency to want to overfeed the children either by bringing a large quantity of food, but also not monitoring the amount of food the children were consuming, in particular [the daughter]."[8]  Lamping's interventions with mother included speaking with the parents "about portion control and appropriate portion sizes for the [children's] age.  I provided small—like dessert-size paper plates . . . rather than giving [the daughter] the entire container with food.  I provided handouts regarding proportion size and nutrition for toddlers, and I spoke to them about some psycho-education around why [the daughter] might have a tendency to want to eat as much as she was eating due to not having enough food when she was with her parents."  Asked whether she observed any improvements on these issues by either parent, Lamping answered, "No.  They continued to need prompting for every visit."

Lamping's testimony regarding the shift of concern from mother's mental health, which was increasingly under control, to her parenting skills, strongly suggests that the delay of several months in the receipt of the psychological evaluations of mother were of little practical importance.

Finally, unlike *Patricia W.*, in which psychological evaluations of the parents were never sought by the agency, they were sought and produced in

---

[8] It appears that during some of Lamping's early therapeutic visits, the son was being fed tubally in a hospital or by a resource parent who was a pediatric nurse, which is seemingly why Lamping's testimony focused on the feeding of the daughter.

29

this case, albeit two or three months late, and the IMPACT team immediately assessed and monitored mother's mental health.

In the context of the considerable information about mother's admitted schizophrenia collected and documented by the reunification team, the defects in Dr. Shelley's evaluation of mother's mental health testified to by Dr. Oertel are relatively insignificant.

Reunification services need not be perfect. (*Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.) The reunification services provided here " 'identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult.' " (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 972–973, quoting *In re Riva M.* (1991) 235 Cal.App.3d 403, 414.)

## DISPOSITION

The record in this case contains substantial evidence from which a reasonable factfinder could find it highly probable parents failed to make "substantive progress" in eliminating the factors leading to the removal of their children, and that parents received reasonable reunification services. (See *O.B.*, *supra*, 9 Cal.5th at p. 1011.)

Viewing the record in the light most favorable to the prevailing party below and giving appropriate deference to how the trier of fact evaluated the credibility of witnesses, resolved conflicts in the evidence, and drew reasonable inferences from the evidence, as we must (*O.B.*, *supra*, 9 Cal.5th at pp. 1011–1012.), we have no difficulty affirming the juvenile court's order of January 7, 2020.

The petition for extraordinary writ is denied on the merits. Our stay of the section 366.26 hearing is dissolved. Our decision is final as to this court immediately. (Cal. Rules of Court, rule 8.490(b)(2)(A).)

 

                                      _____
                                      Kline, P.J.

We concur:

_____
Richman, J.

_____
Stewart, J.

*B.R. et al. v. Marin County Superior Court; Marin County Department of Health and Human Services, RPI* (A161022)